*E-filed 7/17/08*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

MARK HOUSTON,

    Plaintiff,

  v.

COUNTRY COACH, INC.,

    Defendant.

No. C 07-00859 HRL

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

On account of his unhappy experiences as the owner of one of defendant's motor homes, Mark Houston sues for breach of warranty under California's Song-Beverly Consumer Warranty Act (CAL. CIV. CODE §1790.1 et seq.) and the federal Magnuson-Moss Warranty Act (15 U.S.C. § 2301 et seq.). His case was tried to the Court on April 21-22, 2008. The Court heard the testimony of six live witnesses, received documentary evidence, and inspected the motor home in question. Having considered all of the evidence, the arguments of counsel, and the parties' proposed findings of fact and conclusions of law, the Court now makes its findings and conclusions.[1]

---

[1] To the extent that any statement in the findings makes reference to the law, or any conclusion includes any matter of fact, it shall be deemed both a finding of fact and a conclusion of law.

**Findings of Fact**

1. Plaintiff purchases the motor home.

Mark Houston and his wife, Barbara, live in Penn Valley, California, about an hour drive northeast from Sacramento. In late 2004 they were in the market for something bigger and more comfortable than their 36 foot Allegro Bay motor home. After shopping around, they found a dealer they liked, Guaranty RV ("Guaranty"), in Gilroy. The salesman there steered them to a Country Coach "Inspire," a luxurious 40 foot coach, with slideouts, powered by a diesel engine. The price was $239,000. Houston traded in the Allegro Bay, obtained financing through Guaranty, and signed the papers for a new Inspire on January 31, 2005. His new coach was not in Guaranty's inventory at that time; it was driven to Guaranty from Country Coach's Oregon plant a few days later. When it did arrive, Guaranty, following Houston's instructions, removed his satellite dish from the Allegro Bay and installed it on the new Inspire. Installation involved attaching the dish on the roof near the front of the coach and drilling a hole through the roof to run the cable to connect to the "entertainment center" inside. Guaranty also installed aftermarket solar panels that Houston wanted. Houston and his wife picked up the motor home on February 12 and immediately drove south to visit friends in Ventura.

2. The express warranty.

The Country Coach House/Coach Limited Warranty ("express warranty") provided one year "Basic" coverage and five year "Structural" coverage. The "Basic" coverage

> applies to all portions of the motorhome manufactured by Country Coach. It also applies to Country Coach's installation of separately warranted component parts; however, it does not cover any problems with the separately warranted components themselves.

The "Structural" coverage applies to "the welds on the roof and sidewall steel structure on the coach." Pursuant to the express warranty, the owner was to take the motor home "to an authorized Country Coach dealer or service facility within the warranty period and request the needed repairs." It is undisputed that Guaranty was one such authorized facility.

//

2

3. The roof leak.

A day or so after the Houstons arrived in Ventura, it began to rain heavily. At some point Barbara Houston noticed water leaking into the coach. The two ceiling-mounted light fixtures behind the driver and passenger seats were "filled" with water. Water puddled on top of the overhead cabinet behind the driver's seat and ran down the wall. More rainwater flowed from a vent in the ceiling above the seats and some dripped onto the dashboard. Houston called Guaranty and they told him to bring the coach back. It continued to rain that day and the next. On February 21, on their way back from Venture, the Houstons delivered the coach to Guaranty.

Houston and his wife used a bucket to catch dripping water and towels to wipe up what they could. Houston acknowledged he did nothing to try to stem further intrusion of water into the coach once the leak was discovered. For example, he did not cover the roof with a tarp, try to find covered parking, or seek a repair facility in the Ventura area. (The Country Coach express warranty says, "Warranty coverage does not apply to collateral damage caused by delays in reporting a warranty defect. For this reason, warranty defects should be reported and tendered for repair promptly.") Houston said he did, as instructed, promptly call Guaranty, but that all he was told to do was to bring the coach in. Nothing was said about how quickly he should return the coach or about any preventative measures he should take. No one from Guaranty testified about this telephone call.[2]

Country Coach argued that Houston's failure to promptly try to stop the leaking was evidence of his failure to mitigate. Yet, it offered no evidence suggesting that the additional rainwater, if any, that intruded (either because of the delay in obtaining repair, or because Houston did not take any precautionary action once the leak was discovered) affected the

---

[2] In fact, no one from Guaranty testified at all during the trial, even though there were a number of material factual issues about which the court wished it had heard from someone knowledgeable from Guaranty. Although the Guaranty Gilroy location is no longer open, Guaranty has two other locations and is still an authorized Country Coach dealer.

3

severity or extent of damage. It also offered no measure or means that the court might use to calculate an offset.

     4.  Roof leak repair.

     The work order for the Houston coach's February 21 visit to the Guaranty shop listed five "jobs:" the roof leak, and four other warranty items that are not the subject of dispute in this case.  With respect to the roof leak the work order read:

> C/S [Customer states] water is leaking into coach at front over drivers area. Both ceiling lights behind driver/passenger seat filled up with water. Cabinet over left of driver's seat filled with water and damaged cabinet. Water drips on dash.
> Cause: Bad Seal
> Correction: After inspecting roof & light, found a pinch at roof AC [air conditioner] seal. Removed old seals, cleaned surface, and replaced with new. Remove lights to drain water, replaced gasket. reinstalled all, tested for leaks, none found. Remove and replace wood panel underneath entertainment center. Scraped away old wood and pulled staple. Tested, works fine.

Unfortunately, since Guaranty reportedly "lost" its shop records, the court did not have the benefit of the technician's notes which may have explained in detail exactly how he traced the cause of the leak to what he called a "pinch" in the seal on the front air conditioning unit. The Customer Work Order does show that a new gasket for a Dometic air conditioner (A/C) was ordered and subsequently installed.  This Work Order was sent by Guaranty to Country Coach.

     A Country Coach record (Ex. 15) reports a telephone conversation that occurred on or about March 1 with "Rachel" of Guaranty about obtaining authorization for warranty repairs to the Houston coach. It says:

> Attached are pictures of this coach. There was a huge leak in the coach- We believe it came from the AC- the seal around the entire AC was completely gone, so our tech resealed the whole thing. The coach was flooding inside because of the leak- and it dmaged [sic] the wood piece where the audio/visual over the p/s is. There is warping on the cabinet (we have pictures). [. . . ]
> 3/1/05 We need to remove & replace the entire damaged wood piece of the audio/visual over passenger side. We are requesting 3 hours to do this. As for the seal with the AC, I need to get back to you with the time.[3]

---

[3] The referenced photographs never turned up for the trial.

4

Intriguingly, Country Coach records (Ex. 111) also document a telephone call from Mark Houston on March 1. Houston complained about the severity of the water leak on the roof (water "pouring in") and wondered if it had been caused by Guaranty when it installed the satellite dish and solar panels on the roof. "Mark is afraid of water damage in the roof that may not show up now but may show up in the future. (Guaranty issue)?"

After the coach left the shop on April 14 (the repairs were delayed while waiting for parts), Guaranty sent a Warranty Claim to Country Coach, seeking payment for the five jobs on the February 21 Work Order. With respect to the roof leak job, the Claim notes the Country Coach repair authorization number (I050748) and summarizes the Work Order as follows:

> Customer states water is leaking into coach at front over drivers area. Both ceiling lights behind D/S & P/S seat filled up with water. Cabinet over left of drivers seat filled with water & damaged cabinet. Water drips on dash. Bad seal. Inspected roof and light.

Although Country Coach was on notice that Houston wondered whether Guaranty's aftermarket installation of the satellite dish and solar panels caused the leak, and despite Guaranty's two seemingly conflicting explanations about why the air conditioner gasket was the cause ("pinch[ed]" verses "gone"), Country Coach paid for the repair under warranty without question.

Country Coach now contends that the roof leak was caused by Guaranty's faulty installation of the satellite dish, an installation for which Country Coach bears no responsibility and which concededly would not be covered by the Country Coach warranty. In support, Country Coach relies on the fact that each if its products undergo a water leak test before leaving the plant. If a leak is detected, it is immediately fixed. (However, no testimony was offered as to the details of this inspection.) Furthermore, both the Country Coach sales department and Guaranty performed pre-delivery visual inspections which likewise did not detect any leaks. Country Coach also relies on the testimony of its expert witness, Kevin Kiscoan (a customer service employee of Country Coach with many years of experience in the RV business). Kiscoan testified that he never heard of such a thing as a

5

"pinched" A/C gasket and that these particular gaskets were too thick to pinch. He also said that they came from the manufacturer of the A/C unit already stuck to the underside. Furthermore, Kiscoan could not think of any explanation for the Guaranty remark that the gasket was "gone." He acknowledged he had never actually looked at the Houston coach, but believed that was not necessary. The roof leak, he said, *must* have been the result of Guaranty's faulty installation of the satellite dish because, to his mind, there was no other logical explanation.

This court rejects Kiscoan's opinion and finds that the roof leak at issue occurred because of a deficiency in the installation by Country Coach of the front rooftop-mounted Dometic air conditioner. There is no evidence of a leak at the place where the roof was penetrated to run the wire for the satellite dish.[4] There was no evidence that any repair was ever done at that location, and no evidence that anyone connected with Guaranty or Country Coach at the time in question ever considered that the satellite dish installation could possibly be the cause of the leak (even though Houston had speculated to Country Coach that it might be). The employees of Guaranty (the defendant's authorized agent) are the only ones who examined the coach to determine the cause, and they concluded it was the A/C gasket. They replaced the A/C gasket, and the roof never leaked again. Country Coach accepted Guaranty's explanation for the leak and paid the repair bill without question or investigation. Country Coach admitted that, if the leak had been caused by the A/C seal, it would be covered under the one year "Basic" warranty. Defendant's attempt to finger the satellite dish installation relies on speculation. The actual evidence points to the A/C gasket.[5]

---

[4] Much later someone noted that there were multiple layers of sealant applied at the point where the satellite cable penetrated the roof. All that shows is that someone, at some time, applied sealant more than once. It does not prove that someone was repairing a leak. Indeed, it might suggest that someone was being particularly conscientious about preventative maintenance.

[5] When this court asked defense counsel if he was, in effect, arguing that Guaranty had submitted a "phony" warranty claim to Country Coach (blaming the A/C gasket rather than the "true" culprit: the Guaranty satellite dish installation), counsel categorically refused to agree. Thus, County Coach appears to be simultaneously disputing *and* not disputing its agent's diagnosis of the cause of the leak!

6

5. Aftermath of the roof leak.

After the A/C gasket was replaced, no further roof leak was observed. However, much later, in June 2006, Houston brought in the coach for additional work to another of defendant's authorized dealers, Country Coach Showcase (CCS), in Sacramento. One of the items Houston was concerned about was the way the vinyl interior wall covering behind the driver's seat was peeling away. (Ex 12). The CCS technician did not get to that task until August 21. His notes indicate that the wall on the driver's side below the window was warped. Warping suggests water intrusion, so he "pulled the window frame off" (after getting authorization from Country Coach's Kevin Kiscoan) and observed "a little mold on the wood trim." He thought that fixing this "will be too mutch [sic] work for this shop." (Ex 13). There is no indication that Houston was told about the technician's findings or that Country Coach took any steps to address the situation further.

At the end of August 2006, Houston brought the coach to Performance Color in Sacramento for some warranty work with respect to the exterior paint. It is not clear whether Houston mentioned his concerns about the wall behind the driver's seat to Performance Color, or whether Performance Color found the problem on its own. Regardless, warping (or, "bowing") was observed both on the interior and exterior walls immediately adjacent to the driver's seat. A water leak was suspected as the cause. Country Coach was contacted. Although Performance Color was not one of Country Coach's authorized service centers, Kiscoan authorized them to cut an opening in the wall to make an assessment. A hole (roughly 12" by 18") was cut through the vinyl wall covering and the underlying layer of luan plywood in the wall just behind the driver's seat. That opening revealed one of the vertical structural steel supports for the wall, surrounded by an insulating foam material. The steel was badly rusted, and the insulation was stained black by mold.

Country Coach's Kiscoan asked fellow employee Bob Vinson to stop at Performance Color in Sacramento on his way south on other business and take a look at the motor home.

1   Kiscoan was supposed to coordinate Vinson's inspection with Houston, so that Houston
2   could be present. However, in what Kiscoan dismissed as a "miscommunication," Houston
3   was given the wrong information and missed Vinson's inspection. Vinson said that he spent
4   about an hour looking at various parts of the coach, but did not do a written report, take
5   pictures, or make any sketches. Despite this, he testified at trial that he discovered a 5/8" gap
6   in the exterior sealant at the top, front above the driver's side window and a 1/8" gap at the
7   top, rear above that window. (Vinson was not designated as an expert, so he could not offer
8   an opinion as to whether these gaps had permitted any water intrusion, especially any related
9   to the damage seen in the cutout in the wall.) Kiscoan, defendant's only designated "expert,"
10  apparently never saw these gaps.[6]

11  It is not clear whether the gaps Vinson described—where the "front cap and roof cap
12  joined"—describe the seal around the window. If these gaps existed around the window seal,
13  they might logically be the result of the recent removal and reinstallation of this window by
14  the CCS technician at defendant's authorized dealer. (*See* Ex. 13). But, if the cap seal and
15  window seal are different, then the evidence is confusingly inconclusive. There is no
16  evidence that there were gaps in caulking around either the caps near the driver's window or
17  the driver's window itself before the window work was done at CCS. The CCS technician—
18  who was looking for leaks in that area—would presumably have seen the "gaps" reportedly
19  seen by Vinson just a few months later. Houston testified that he did inspect and caulk as
20  needed all exterior seals every six months. There is no evidence that any water intruded
21  through these gaps, even if they did exist.[7] Country Coach took the position that any leak
22  was probably due to Houston's failure to inspect and caulk as necessary all windows, doors,

---

[6] Kiscoan's note (Ex. 116) of Vinson's comments to him attributes the leak to a "small void" [singular] in the sealant which was caused by lack of preventative maintenance by the owner, and says Houston "has *some* responsibility with the damage" (emphasis not in original).

[7] To be fair, the court was not anticipating testimony about gaps in the sealant by the driver's side window when it inspected the motor home, so this area was not closely examined.

8

and other openings in the exterior of the motor home every six months. Therefore, it refused to authorize any repairs or remedial action for the newly discovered wall damage.

Michael Eidsmoe, plaintiff's expert, described how a motor home like the Country Coach Inspire is constructed. Of particular interest are the walls and the roof. The walls are layers of material: a vinyl wall covering, luan plywood, steel structural tubing surrounded by styrene insulation, more luan plywood, then fiberglass. During manufacture, each layer is coated with adhesive and then all of them are vacuum "compressed" together permanently. The wall units are then affixed to the floor, which is itself a bonded unit much like the walls. The roof is also a sandwich of bonded layers: a sheet of vinyl, foam padding, a steel frame, styrene insulation, luan plywood, and a one piece fiberglass outer layer. Significantly, neither the walls nor the ceiling have drains, and if water penetrates into these interiors, it cannot get out unless it happens to flow to where there is an opening (i.e., a cutout for an electrical plug). If water does not find a way out, it stays there indefinitely.

Furthermore, said Eidsmoe, there is really no way for anyone to get that trapped water out. The walls and roof are made of layers of material that have been *permanently* bonded together. You cannot simply open up the walls, fix the problem, and close them. You would actually destroy (Eidsmoe's word was "deconstruct") the walls in the process of opening them to gain working access to problem areas. If you create cutouts, you cannot vacuum seal patches back in place. Significantly, defendant's expert Kiscoan testified that, if the leak test at the factory discloses a leak, the leak is patched and then special fans and humidifiers are used to dry out the water. This court is not convinced that fans and humidifiers would have been able to dry the water that intruded into the bonded and sealed roof and walls, and—even if they could have—there is no indication that Guaranty employed these techniques in "fixing" the roof leak of mid-February 2005. (Although Houston testified that Guaranty told him they had "dried" the water, whatever that means.)

Eidsmoe inspected Houston's coach. He saw the cutout behind the driver's seat and the rusty portion of the steel support frame. He saw the mold on the insulation. Eidsmoe also saw, as did the court upon its inspection, widespread speckles of mold on the ceiling

9

behind the driver's seat. Since he first saw the coach years after the water intrusion had been repaired, Eidsmoe had no way to independently identify the cause. Instead, he relied on the repair documentation. Country Coach's own authorized repair shop had traced the leak to the A/C gasket, and, in his opinion, that explained why he was seeing rusty steel and black mold inside the wall, and now, on the ceiling as well.

This court rejects defendant's assertion that the interior rust damage and mold in the opening behind the driver's seat are the results of the owner's lack of preventive maintenance. Instead, it concludes that they are the results of the leak through the A/C gasket back in February 2005, a consequence that had not and could not have been discovered (by Houston at least) any sooner than it was.

6. Other Warranty Claims, Tolling the Warranty, and Timely Repairs.

Houston made numerous other warranty claims that were addressed, mostly, to his satisfaction. With the exception of exterior body paint, to be discussed below, none of these claims are the subject of this lawsuit. (This lawsuit, said plaintiff's counsel, is about the "roof leak and paint.") They are mentioned now because they are pertinent to tolling of the expiration of the one year warranty period and to a claim based upon delays in making repairs. The motor home was in the shop for 53 days to fix the roof leak (and the other four jobs on the original warranty repair order). It went back in April 2005 for 38 days to fix the "rear satellite" and then to replace the windshield that Guaranty cracked while it had the coach. In July it went back for three days for more warranty work. In August, because Houston was tired of driving all the way from Penn Valley to Gilroy, he took the motor home to Rancho Cordova Independent Diesel Repair (an authorized service center for Country Coach). It stayed there for 62 days while thirteen warranty items were corrected. It went back to Rancho Cordova in December 2005, and the warranty work was not done until April, 125 days later. However, the coach was not at the Rancho Cordova premises continuously for the full 125 days. For a portion of the time the coach was moved into the shop of Performance Color (not an affiliate of Country Coach) for repairs caused by a minor highway

10

accident. While at Performance Color, and before going back to Ranch Cordova, Houston raised warranty claims over the exterior paint job.

By its terms, the one year Basic warranty would expire on February 12, 2006. There are two invoices from Performance Color to Country Coach for warranty paint work, both dated February 28. One invoice is for repainting the bubbling paint on the bedroom slideout, caused by glue from the wall's interior seeping through the fiberglass. (Ex 26). The other is to repair and repaint "spider cracks" in the fiberglass on the front of the coach. (Ex 27). Jody Eaton, the owner of Performance Color, testified that he discussed paint problems with Houston in January, when he was repairing the accident damage, but did not recall or document exactly when his estimator contacted Country Coach to make the warranty claims. Country Coach now says the claims ware made too late, after expiration of the warranty. Although it did pay them, it says it did so as a courtesy to Houston.

Although dealer/service center records indicate that the motor home was "in the shop" for about 186 days during the first year of ownership, it was not actually out of Houston's possession all of that time. Almost without exception, the warranty items did not prevent Houston from using the coach. He acknowledged that at times, when it was in the shop waiting for parts, he would pick it up and take it on a trip. Bill French of Rancho Cordova Independent Diesel testified that Houston "always needed it," and he would come by frequently and pick the coach up to take a trip and then bring it back afterwards. Tolling occurs when the coach is in the shop for warranty repairs. There is no way to calculate just how many days the warranty was tolled, but the weight of the evidence is that it was at the very least tolled until the two paint invoices were submitted, February 28, 2006, a mere 16 days after it would have otherwise expired. And, Country Coach did pay the two claims, which supports an inference, despite its current assertion, that it calculated that the warranty was still in effect.

The subsequent warranty claims concerning paint are more problematic. In September 2006, Performance Color asked Country Coach to cover under warranty the cost to repaint the maroon and green stripes on both sides of the coach. There were tiny blisters

11

in the clear coat which were likely the result of the coat being applied too thickly. Country Coach denied coverage. Then, in November 2006, Country Coach was asked to pay for a repainting of almost the entire coach, partly on account of the blistering noted in September and partly because of a condition that was described as "orange peel." (The paint had not dried to a smooth finish.) Country Coach again denied coverage.

This court finds that the warranty did cover paint (a conclusion which defendant now disputes). However, the paint warranty's expiration was not tolled all the way to September 2006. And, the paint "problems" identified in September and November were not the same problems that Country Coach had been advised of and dealt with (supposedly, as a courtesy) back in February. The court rejects the testimony of Jody Eaton that the bubbling on the slideout noticed in February was the "same" problem that was raised some months later. The tiny blisters and the orange peel finish, both apparently caused by improper application of paint at the factory, existed from the moment Houston first picked up the coach. It was too late to first bring them up in the fall of 2006.

7. Revocation.

Houston testified that he spoke a number of times with Country Coach's Jim Cooley about his general dissatisfaction with the Inspire because of all the warranty issues and the time it was spending in the shop. According to Houston, Cooley agreed that Houston had experienced more than his share of problems. On one or two occasions Cooley told plaintiff that, if he traded in the coach on a new one, Cooley would see he received a favorable trade in price. (Houston looked into it, but balked at the cost of a new coach.) In the summer of 2006 (before the consequences of the roof leak were known to plaintiff), Houston asked Country Coach to replace his Inspire with a new one and give him a loaner in the meantime. Cooley, who initially seemed agreeable to the suggestion, said he would let him know within a week. But, according to Houston's testimony, when they next spoke Cooley denied having offered to replace Houston's coach and refused to do so. Houston did not pursue the issue further and continued to make warranty claims (at least some of which defendant honored) and to use the coach. While it is clear that Houston was disenchanted with his purchase, the

12

evidence is at best equivocal as to whether he intended to revoke or whether—if he did—he succeeded.

8. Damages.

Because plaintiff failed to timely designate an appropriate expert, the court received no evidence of damages. The court rejects plaintiff's own opinion that the motor home in its present condition was worth "nothing."

9. Offset for personal use.

The motor home had 728 miles on the odometer when Houston bought it and about 19,000 miles by the time of trial. There was testimony that Houston and his wife used the coach often in 2005 and 2006, but hardly ever afterward. Of course, some of those 19,000 miles were spent driving to and from Guaranty, or Rancho Cordova Independent Diesel, or Country Coach Showcase in Sacramento. Defendant argues that it is entitled to an offset for the reasonable value of plaintiff's use of the motor home. Plaintiff agrees. However, defendant offered no evidence of the number of miles the coach was used for recreation. Even if the court were to consider all the miles driven by Houston (19,000 minus 728), defendant offered no evidence (in fact, not even any suggestion) of a measure, method, or formula (i.e., operating costs, rental value, depreciation, etc.) that the court might use to calculate an offset.

10. "Purchase Price"

As previously stated, Houston agreed to pay Guaranty $239,000 for the motor home. He made a $53,000 down payment and financed the balance. Since then, he has made loan payments in the amount of $65,856.71. The current payoff amount is $212,277.27. Total paid and owed: $331,133.98.

11. Stipulated Facts.

With respect to the two statutes at issue, the parties stipulated to the following "facts:"

    a. Plaintiff is a "buyer" under Cal. Civ. Code § 1791(b);
    b. The coach is a "consumer good" under Cal. Civ. Code § 1791(a);

      c. Country Coach is a "manufacturer" as defined by Cal. Civ. Code § 1791(j);

      d. Plaintiff's purchase of the vehicle was a "sale" as defined by Cal. Civ. Code § 1791(n);

      e. Pursuant to Cal. Civ. Code § 1972, the vehicle was accompanied by the manufacturer's implied warranty of merchantability;

      f. The vehicle is a "consumer product" as defined by 15 U.S.C. § 2301(1);

      g. Plaintiff is a "consumer" as defined by 15 U.S.C. § 2301(3);

      h. Country Coach is a "supplier" and a "warranter" as defined respectively by 15 U.S.C. § 2301(4) and (5);

      i. The express written warranties are "written warranties" as defined by 15 U.S.C. § 2301(6).

**Conclusions of Law**

    1. The paint defects claim.

Although the court concludes that the warranty with respect to paint was tolled at least until the February 2006 claims were presented, it had expired by September 2006. Without getting into the question of whether the orange peel finish on the exterior body paint and the pin hole blisters in the exterior clear coat are actually defects, these claims were not raised until after any applicable warranty had expired. Plaintiff is not entitled to any recovery on account of paint defects.

    2. Claim based on the roof leak.

      a. Recovery under Cal. Civ. Code § 1793.2(b).

Plaintiff seeks recovery under Cal. Civ. Code § 1793.2(b), which provides a remedy, subject to the exceptions noted there, if a manufacturer fails to complete warranty repairs within thirty days. The evidence on the timely completion of repairs was sketchy and inconclusive. Certainly, the dealer/service center records, which list the dates when the motor home went "in" and when it went "out" of the shop, show several periods of time greater than thirty days. But, the plaintiff frequently retook possession of the coach while it was in the shop, used it for recreation, and then brought it back. Likewise, some of the time

14

1  in the shop was due to delays in obtaining parts. Because such factors are beyond
2  defendant's control, those delays extended the thirty day limit. The court concludes that
3  plaintiff failed to prove a violation of 1793.2(b).

                b. Implied Warranty of Merchantability (CAL. CIV. CODE §1974(a))

5  Despite the attempted disclaimer in defendant's express warranty, the Houston motor
6  home was covered by an implied warranty of merchantability. *See* CAL. CIV. CODE § 1792.3.
7  Defendant breached the implied warranty of merchantability by selling a motor home to
8  plaintiff with an improperly installed seal on the front A/C unit resulting in the intrusion and
9  permanent entrapment of a substantial volume of rain water inside the roof and walls.

10  This breach of warranty occurred within the basic one year warranty period and was
11  never successfully remedied. While defendant did promptly repair the leak, it made little or
12  no attempt to address the consequences likely to occur from the permanent presence of the
13  water in the roof and walls. It certainly never advised Houston of the likely long term effects
14  of the water intrusion. The defendant's failure was not known or knowable to plaintiff until
15  November 2006.

16  If proven, plaintiff would be entitled to damages under Cal. Civ. Code § 1974(a). The
17  court, however, concludes that none can be awarded because of a failure of proof.

18  Plaintiff did not establish entitlement to revocation and restitution under Cal. Civ.
19  Code § 1794(b)(1) and Cal. Com. Code § 2608. *See Gavaldon v. Daimler Chrysler Corp.*, 32
20  Cal. 4th 1246, 1264 (Cal. 2004).

21                  c. Breach of Express Warranty (CAL. CIV. CODE § 1793(d)(1))

22  As defendant itself acknowledges, its Basic express warranty covered water intrusion
23  through a faulty A/C seal on the roof during the warranty period. That warranty was
24  breached within a few days after the coach was delivered to Houston. Defendant had two
25  opportunities (i.e. "attempts") to correct the nonconformity: (1) when it repaired the leak (but
26  not the effects of the leak) in early 2005, and (2) when it authorized Performance Color in
27  November 2006 to open up the wall behind the driver's seat. *See Robertson v. Fleetwood*
28  *Travel Trailers*, 144 Cal. App. 4th 785, 50 Cal. Rptr. 3d 731, 799 (2006) When plaintiff

15

asked defendant to remedy the nonconformity promptly after he discovered it, defendant refused to acknowledge responsibility or take any remedial action. It had at least two opportunities to repair and absolutely declined to try again.[8]

Since its failure to correct the breach could not have been discovered by plaintiff sooner than November 2006, and since the earlier attempted repairs did not "remedy the nonconformity"(CAL. CIV. CODE § 1795.6(b)), the warranty coverage for the roof leak did not expire when the one year Basic warranty otherwise expired.

In any event, the court concludes that the five year Structural Coverage warranty, which specifically applies to the "sidewall steel structure" also covers the roof leak. The single sentence in the House/Coach Limited warranty describing Structural Coverage is cryptic and ambiguous: "Structural Coverage applies to the welds on the roof and sidewall steel structure on the coach." It *could* mean it only applies to the welds on the roof *and* the welds on the sidewall structure, but that is not specifically what it says. The court, construing the ambiguity in favor of the consumer, concludes that "welds" may be a limitation on coverage to the roof but not a word of limitation as to the sidewall structure. Rust growing on the steel sidewall structure would affect the integrity of the entire coach (and mold would portend health dangers). A five year period of coverage against damage of that magnitude, especially when it might not reveal itself until years after the triggering event, is both reasonable and appropriate. *See* 15 U.S.C. § 2302 et seq.

While Houston did not establish revocation, he is entitled to recover under Cal. Civ. Code § 1793.2 (d)(1) for defendant's refusal to remedy the consequences of its breach of express warranty: "[T]he manufacturer shall either replace the goods or reimburse the buyer in an amount equal to the purchase price paid by the buyer, less that amount directly attributable to use by the buyer prior to the discovery of the nonconformity." "Purchase price" has been interpreted for 1793.2(d)(1) purposes to include finance charges. *Robertson,* 144 Cal. App. 4th at 814.

---

[8] Actually, defendant had three opportunities if one includes the August 21, 2006 attempt by the CCS technician described above at page 7, lines 4-10.

16

Must plaintiff return the coach to defendant? Surprisingly, neither party addressed that issue, and the court's own research found no helpful authority. However, common sense and basic fairness leads this court to conclude that, if plaintiff is to have his purchase price returned, then defendant should have its coach back.

### d. Offset for Houston's use of the motor home.

Under the law, Country Coach is entitled to an offset against any award for the reasonable value of Houston's use of the coach. However, since the court heard no evidence supporting any way to measure that value, it concludes that no offset can be awarded.

### e. Mitigation.

Defendant argues that plaintiff failed to mitigate his damages and should thus be barred from any recovery. But, failure to mitigate is not a bar to recovery; it is a reduction or offset against the recovery. As discussed above, the burden of proof was on defendant to show failure to mitigate, and its proof fell short. Country Coach offered no evidence that anything the plaintiff might have done would have made any difference, or that any delay in seeking repair for the roof leak increased or exacerbated in any measurable way the amount of water intrusion or the resulting damage. Houston says that under the Song-Beverly Act the defendant as a matter of law is not entitled to any offset for plaintiff's failure to mitigate, citing §1793.2(d)(1) and §1794(a) and (b). However, since the court concludes that defendant has not proven failure to mitigate, it does not address Houston's argument.

### f. Willfulness.

The court does not find defendant's action and inactions "willful" within the meaning of § 1794( c) and does not impose a civil penalty.

### g. Federal Claim.

Since the plaintiff's potential remedies for violation of the Magnuson-Moss Warranty Act are not greater than his remedies under Song-Beverly, there is no need to address his federal claim.

//

//

3. Conclusion

Conditioned upon Houston's tender of return of the motor home, Country Coach shall "reimburse" plaintiff the purchase price of $331,133.98. Judgment shall issue accordingly.

**IT IS SO ORDERED.**

Dated:    7/17/08



HOWARD R. LLOYD
UNITED STATES MAGISTRATE JUDGE

18

THIS SHALL CERTIFY THAT NOTICE WILL BE SENT TO:

Terry L. Baker  tbaker@consumerlawgroup.net

Kevin J. Tully  kevin@tullylaw.net, jeanine@tullylaw.net, julie@tullylaw.net

\* Counsel are responsible for providing copies of this order to co-counsel who have not registered for e-filing.

Date:   7/17/08                                    MPK
                                                   Chambers of Magistrate Judge Howard R. Lloyd